FILED

UNITED STATES DISTRICT COURT 2016 MAR 16  AM 11: 12
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION     U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS. FLORIDA

| | |
|---|---|
| SALON ADRIAN, INC., on behalf of itself and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>CBL & ASSOCIATES, INC., a Tennessee corporation,<br><br>               Defendant. | Case No. _____<br><br>2:16-CV-206-FtM-38mrn |

## CLASS ACTION COMPLAINT

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 1 -

010475-11 859854 V1

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ..............................................................................................................2

III.    JURISDICTION ....................................................................................................3

IV.     FACTUAL ALLEGATIONS .................................................................................4

        A.      Salon Adrian Entered Into A Lease With CBL To Rent Retail Space
                At The Gulf Coast Town Center................................................................4

        B.      Salon Adrian Attempted To Mitigate Its Exorbitant Electrical Charges .................5

        C.      CBL Conspired With Valquest To Inflate Salon Adrian's And Other
                Inquiring Tenants' Energy Surveys ..........................................................7

        D.      It Is Illegal In Florida To Mark Up Energy Charges ...............................8

        E.      CBL's Fraud Is Revealed At Gulf Coast Town Center ...........................8

V.      CLASS ACTION ALLEGATIONS .......................................................................9

        A.      Numerosity...............................................................................................10

        B.      Commonality.............................................................................................10

        C.      Typicality .................................................................................................11

        D.      Adequacy of Representation .....................................................................12

        E.      Requirements of Fed. R. Civ. P. 23(b)(3) ...............................................12

                1.      Predominance.................................................................................12

                2.      Superiority......................................................................................13

COUNT I  BREACH OF CONTRACT
        (ON BEHALF OF THE NATIONWIDE CLASS) .........................................13

COUNT II  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING
        (ON BEHALF OF THE NATIONWIDE CLASS) .........................................15

COUNT III  UNJUST ENRICHMENT
        (ON BEHALF OF THE NATIONWIDE CLASS) .........................................16

010475-11 859854 V1

COUNT IV  VIOLATION OF RACKETEER INFLUENCED AND CORRUPT
      ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(A), (C)-(D))
      (ON BEHALF OF THE NATIONWIDE CLASS) ............................................................17

COUNT V  VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
      PRACTICES ACT
      (ON BEHALF OF THE FLORIDA STATUTORY CLASS)............................................23

COUNT VI  VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
      PRACTICES ACT – *PER SE* VIOLATION
      (ON BEHALF OF THE FLORIDA STATUTORY CLASS)............................................24

COUNT VII  VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL
      PRACTICES ACT, FLA. STAT.  §§ 772.103, 772.104(1), 777.011,
      AND 777.03(1)(A)
      (ON BEHALF OF THE FLORIDA STATUTORY CLASS)............................................25

COUNT VIII  VIOLATION OF FLORIDA'S ADMINISTRATIVE CODE 25-6.049
      (ON BEHALF OF THE FLORIDA STATUTORY CLASS)............................................27

RELIEF REQUESTED............................................................................................................28

DEMAND FOR JURY TRIAL .................................................................................................29

010475-11 859854 V1

## I.  INTRODUCTION

1.      CBL & Associates, Inc. ("CBL") for years executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at its shopping malls.  In its standard form lease agreements, CBL falsely represented that it would charge its tenants the amount CBL was charged by the local public utility provider to supply those tenants with electricity.  That is, CBL represented to its tenants that the tenants would pay CBL the same amount for electricity that the tenants would pay if they were purchasing the electricity directly from the local public utility.  Despite its contractual obligations and representations, CBL engaged in a racketeering enterprise and conspiracy and breached its lease agreements with tenants and applicable state law and regulations by inflating its tenants' electric bills.  Sometimes, CBL's fraudulent and illegal markups exceeded 100% of the tenant's actual electricity usage charges.

2.      In an effort to conceal its wrongful and illegal conduct, CBL inserted into its lease agreements a clause requiring its tenants to waive their right to audit CBL's electric bills in exchange for CBL agreeing that it would not mark up their electricity charges.  Whenever tenants raised issues about their electricity costs, CBL informed them that they had waived their audit rights under the lease agreement and refused to provide tenants with CBL's actual electricity bills from the utilities, which would have shown the undisclosed mark-ups. CBL's scheme allowed it to take advantage of its tenants by: (1) fraudulently misrepresenting to them that it was not marking up their electricity charges; (2) actually doing the mark-ups it claimed it would not do; and (3) then covering up that illegal conduct by using the audit waiver provision to shield itself from scrutiny. CBL knew it was much bigger, and much better financed than the thousands of small business owners who rented mall spaces from it.  In exploiting this inequality,

- 1 -

CBL used its vast resources and superior negotiating and bargaining power to actively victimize and defraud its tenants – simply to reap unfair, improper and illegal profits.

3.      CBL's scheme was fully unmasked when CBL's Gulf Coast Town Center mall ("GCTC") went into foreclosure and was taken over by CBL's lender.  As a result, a third-party management company was brought in to manage the mall.  The management company performed a utility usage evaluation at the mall.  It became immediately apparent that CBL had been significantly overcharging its GCTC tenants for electricity.  Not wanting any part of CBL's illicit scheme, the management company immediately reduced the bills for the tenants in GCTC to match the actual electric utility charges.

4.      Plaintiff Salon Adrian, Inc. ("Salon Adrian") was and is a tenant in GCTC.  For years CBL lied to Salon Adrian and told it that Salon Adrian was only paying its share of the actual electricity charges for the mall.  In truth, for years Salon Adrian was tricked into paying more than ten thousand dollars in illicit electricity mark ups to CBL.  Salon Adrian brings this class action lawsuit on behalf of itself and all other similarly situated current and former CBL tenants to: (1) to end CBL's illegal conduct; (2) to require CBL to honor the terms of its lease agreements and charge its tenants only their actual electricity costs going forward; and (3) to return to current and former tenants the illegal electricity mark-ups CBL charged to them and retained for years on end, as well as appropriate damages, interest, and penalties as permitted under the applicable statutes.

## II.      PARTIES

5.      Plaintiff Salon Adrian is an upscale hair and nail salon located at GCTC, an outdoor shopping mall located in Fort Myers, Florida.  Salon Adrian has been located at GCTC since 2006.  Salon Adrian signed a 10 year lease with CBL for its location at GCTC on June 13, 2006.  (Salon Adrian Lease, Ex. A).  During its lease, Salon Adrian received invoices for its

- 2 -

electric costs from CBL, which it believed was the amount charged by the local public utility without any markup by CBL because of representations made to it by CBL. Salon Adrian paid the full amount of those invoices to CBL.

6.     CBL is a Real Estate Investment Trust ("REIT") headquartered in Chattanooga, Tennessee, and incorporated under the laws of Tennessee.  Founded in 1971, CBL is one of the largest shopping center REITs in the United States and owns, holds interests in, or manages 150 properties, including 88 market dominant enclosed malls and open-air centers.  CBL operates in twenty-seven states but is primarily focused in the Southeastern and Midwestern portions of the United States.  CBL's total assets for the 2015 fiscal year were valued at approximately $6.5 billion.

### III.    JURISDICTION

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a), because this is an action for an amount exceeding $5,000,000, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than CBL.  Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961 *et seq*.  The Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d), and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over CBL because it continuously and systematically operates, conducts, engages in, and carries on business in Florida by owning and operating at least five retail shopping centers in Florida.  The Court also has specific jurisdiction over CBL because CBL's wrongful conduct at issue in this lawsuit occurred in Lee County, Florida.  Accordingly, CBL is subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193.

010475-11 859854 V1

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Salon

Adrian's causes of action accrued within this judicial district and a substantial part of the events,

acts, and omissions giving rise to Salon Adrian's claim occurred here.  Furthermore, Salon

Adrian is a Florida corporation and its principal place of business is in this district, CBL

routinely operates and solicits business in this district, and CBL's wrongful acts in this district

have impacted the general public of this district.

## IV.    FACTUAL ALLEGATIONS

### A.    Salon Adrian Entered Into A Lease With CBL To Rent Retail Space At The Gulf Coast Town Center

10.     CBL is one of the largest REITs in the United States and owns or operates more

than 150 shopping malls and open-air centers.  One of CBL's former Florida properties is

GCTC, a retail shopping center featuring over ninety different stores and eateries located in Fort

Myers, Florida.

11.     Salon Adrian is owned and operated by Adrian Jerne Church.  Ms. Church has

worked in the cosmetology business for most of her life – more than forty years.  Ms. Church has

owned various salons and has operated cosmetology schools training countless cosmetologists.

Ms. Church opened Salon Adrian, the second salon that she owned at the time, in GCTC in 2006.

While the rent at the GCTC was substantially more expensive than the rent at her other location,

she hoped that the location would increase her sales and allow her business to grow.

12.     On June 13, 2006, Salon Adrian and CBL entered into a long term 10 year lease

agreement for a retail space at GCTC.  (Attached as Exhibit A).  The leased premises were to be

used and operated as a hair and nail salon.

13.     Among the various provisions in Salon Adrian's lease agreement was the

following:

- 4 -

> Section 2.5 Utilities Charges. (a) Tenant shall pay promptly, as and
> when the same become due and payable, all water rents, rates and
> charges, all sewer rents and all charges for electricity, gas, heat,
> steam, hot and/or chilled water, air conditioning, ventilating,
> lighting systems, and other utilities supplied to the Leased
> Premises.  If any such utilities are not separately metered or
> assessed or are only partially separately metered or associated and
> are used in common with other tenants in the Shopping Center,
> Tenant will pay to Landlord a proportionate share of such charges,
> in addition to Tenant's payments of the separately metered
> charges.  Landlord may install registering meters and collect any
> and all charges aforesaid from Tenant, making returns to the
> proper utility company or government unit, **provided that Tenant
> shall not be charged more than the rates it would be charged
> for same services if furnished directly to the Leased Premises
> by the Local Utility Company,** as hereinafter defined.

(Ex. A at § 2.5) (emphasis added).

14.     Pursuant to § 2.5 of the lease agreement, CBL uniformly promised Plaintiff and

every tenant of every mall where it used an agreement with this language that they would be

charged the same for their electricity as if they were being billed directly by the local public

utility company.  Accordingly, the tenants were to receive their electricity at CBL's cost without

any additional mark up from CBL.

15.     CBL also inserted an audit waiver provision in the lease agreement requiring its

tenants to waive any right to audit CBL's invoices and records to determine whether they were

actually being charged the correct amount for electricity.  Pursuant to § 12.24 of the lease

agreement, "Tenant hereby waives any and all legal and equitable rights it has or may have to

inspect and/or audit Landlord's records and contracts relating to Tenant's charges under the

terms of this Lease . . . ."  (Ex. A at § 12.24).

**B.      Salon Adrian Attempted To Mitigate Its Exorbitant Electrical Charges**

16.     Shortly after Salon Adrian opened its second location at GCTC, it began receiving

as part of its monthly invoice from CBL a line item cost for electricity.  (See Salon Adrian's

- 5 -

Invoices, attached as Exhibit B). Salon Adrian's energy bills averaged over $500 per month, but sometimes CBL would bill as much as $600 or $700 per month, which was substantially more than it paid for electricity at its other location to operate the same business.

17.     While Ms. Church directed Salon Adrian to take on additional costs in the form of increased rent and electricity in hopes of growing her business, the economy of the United States entered into what would be known as the Great Recession.  Florida and the Fort Myers area where Salon Adrian is located were particularly hard hit because of the collapse of the housing market and the loss of the associated jobs related to that sector of the economy.  Almost immediately after taking on the additional costs of renting at GCTC, Salon Adrian began to see a substantial drop in its revenue.

18.     Salon Adrian struggled over the next few years as the Great Recession continued to decimate the local and national economy.  Customers stopped coming altogether or would lengthen the time between appointments.  And when the customers did come, they purchased fewer services.  During this time, Salon Adrian did everything it could to cut costs in order to stave off bankruptcy.

19.     Other than Salon Adrian's rent, one of its largest business expenses is electricity. Ms. Church believed Salon Adrian was being charged electricity based on its actual consumption.  Thus, Ms. Church believed Salon Adrian could substantially reduce its electrical costs by taking on additional debt to purchase state of the art high efficiency lightbulbs and other products.  Salon Adrian spent thousands of dollars to upgrade all of the lights at its location with energy efficient LED lightbulbs.  Salon Adrian also upgraded its appliances and replaced them with new ones with the highest energy efficiencies in order to achieve maximum energy cost savings.

20.     Despite those efforts and the thousands of dollars invested in energy efficient lightbulbs and appliances, there was no corresponding reduction in Salon Adrian's electric bill. In fact, after the upgrades were made, Salon Adrian's energy bills actually increased to more than $600 a month on average.

**C.     CBL Conspired With Valquest To Inflate Salon Adrian's And Other Inquiring Tenants' Energy Surveys**

21.     Valquest Systems, Inc. ("Valquest") is an energy company based in Texas that, among other things, conducts and provides energy surveys and audits. CBL contracted with Valquest to provide CBL tenants with energy surveys that were used to project energy costs for a storefront location or to substantiate the energy costs that CBL billed its tenants when the tenants questioned those amounts.

22.     CBL conspired with Valquest and directed Valquest to artificially inflate the amount of the electricity costs in the energy surveys provided to CBL's tenants. Valquest artificially inflated the electricity costs in return for the payments it received from CBL for conducting the falsified energy surveys. CBL and Valquest knew the Valquest surveys were inaccurate because they inflated the tenants' electricity costs.

23.     For example, Salon Adrian complained about its electricity costs increasing in 2009 after it made upgrades to energy efficient products. CBL paid Valquest and agreed with it to provide Salon Adrian with an energy survey that inflated Salon Adrian's electricity costs in order to substantiate CBL's charges. (See Valquest Energy Audit, attached as Exhibit C). CBL used the inflated energy survey to hide its illegal conduct because it was profiting by marking up Salon Adrian's electricity charges. And it shared those illicit profits with Valquest by paying Valquest's fees for surveys, even though it knew and intended those surveys to be inaccurate.

010475-11 859854 V1

**D.     It Is Illegal In Florida To Mark Up Energy Charges**

24.     It is illegal in Florida for a customer of a public utility to charge its tenants more than the customer's cost as billed by the public utility for electricity.  Specifically, Florida Administrative Code 25-6.049 states, among other things, "[a]ny fees or charges collected by a customer of record for electricity billed to the customer's account by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity."  Thus, a Florida electric utility customer, such as CBL, cannot mark-up the energy costs that it passes along to its tenants.

25.     CBL violated Florida Administrative Code 25-6.049 when it marked up Salon Adrian's and the Class' electrical costs and charged them more for their electricity than the public utility actually billed CBL.

**E.     CBL's Fraud Is Revealed At Gulf Coast Town Center**

26.     In September 2015, CBL was sued by Wells Fargo Bank for defaulting on its $190.8 million mortgage loan that it took out to purchase GCTC.  As a result of CBL's default on the mortgage loan, Wells Fargo took possession of GCTC and hired a new management company unaffiliated with CBL to operate the mall.

27.     The new operator performed an electricity usage evaluation of the entire mall and discovered that CBL had been substantially overcharging its tenants for electricity at GCTC.

28.     On January 27, 2016, the new operator informed Salon Adrian that its energy charge, which was averaging over $600 per month while CBL owned and operated GCTC, would be reduced to $269 a month.  (See Letter to Salon Adrian, attached as Exhibit D).

29.     CBL's practice of overcharging its tenants for energy costs is not isolated to GCTC.  CBL has a nationwide policy and practice of charging its tenants in excess of their actual

costs for electricity, irrespective of the written contracts it provides and the laws of the states in which it operates.

30.    Despite CBL's express promise to charge its tenants no more than what CBL pays for electricity, CBL actually charges its tenants well above the actual costs it pays the local public utility companies for that electricity.  Accordingly, due to CBL's deceitful practice and breach of its lease agreements, Salon Adrian suffered significant and substantial damages in excess of $10,000.

## V.    CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action against Defendant pursuant to Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, on behalf of itself and all other persons and entities similarly situated.  Plaintiff seeks certification of the following two classes (referred to collectively as the "Class"):

**The Nationwide Class**

All individuals and entities that entered into lease agreements with CBL that provided CBL would not mark up or inflate the actual charges CBL paid for electricity and who paid CBL for electricity in connection with such agreements within the applicable limitations period.

Excluded from the Nationwide Class are CBL, its affiliates and related companies, its directors, corporate officers, and their immediate family members, and any government entity.

**The Florida Statutory Class**

All individuals and entities that leased space from CBL in Florida and who paid CBL for electricity in excess of the cost of such electricity had it been purchased directly from the utility provider.

Excluded from the Florida Statutory Class are CBL, its affiliates and related companies, its directors, corporate officers, and their immediate family members, and any government entity.

010475-11 859854 V1

## A.     Numerosity

32.     The Nationwide Class consist of thousands of current and former tenants who entered into lease agreements with CBL for the purpose of using the premises owned by CBL for retail activities and related services.  The Florida Statutory Class consists of hundreds—if not thousands—of current and former tenants at CBL owned malls in Florida who were charged more than their actual electricity costs for their electricity use at a CBL-owned mall.

33.     The names and addresses of all Class members can be identified in the business records maintained by CBL.  The precise number of Class members will be obtained through discovery but based on publicly available information, the numbers are clearly more than can be consolidated in one action, and it is impractical for each Class member to bring suit individually.  For example, CBL's annual reports indicate that it owns 72 mall properties across 27 states, including five mall properties in Florida.  Those malls contain tens of millions of rentable square feet.  As a result, there are likely at least hundreds of Florida Statutory Class members, and at least thousands of Nationwide Class members at any specific point in time, and due to turnover, the actual number of current and former tenants who are Class members is likely a multiple of that amount.  Plaintiff does not anticipate any difficulties in the management of the action as a class action.

## B.     Commonality

34.     There are questions of law and fact that are common to the claims of Plaintiff and the Class.  These common questions predominate over any questions that are particular to any individual Class member.  Among such common questions of law and fact are the following:

      a.     Whether CBL marked up the electric charges that it charged its tenants;

      b.     Whether CBL violated Florida's administrative code by charging its tenants more for electricity than it was billed by CBL for that electricity;

- 10 -

c.  Whether CBL breached its lease agreements by charging its tenants for electricity in excess of what CBL paid the public utilities for that electricity;

d.  Whether CBL breached the implied covenant of good faith and fair dealing in its lease agreements when it charged its tenants amounts for electricity greater than what CBL paid the public utilities for that electricity;

e.  Whether CBL was unjustly enriched by charging amounts for electricity in excess of the actual amounts charged by the public utilities for that electricity;

f.  Whether CBL engaged in a deceptive and unfair business practice by misleading the Class by putting in the lease agreement that it would not charge its tenants in excess of the actual costs for electricity and then charging them amounts in excess of the actual electricity costs;

g.  Whether CBL has a policy or practice of overcharging the Class members for energy costs at all of its locations in direct contravention of the lease agreements;

h.  Whether CBL, in conjunction with Valquest, formed a criminal enterprise with the intention of overcharging CBL customers for electricity;

i.  Whether CBL violated 18 U.S.C. § 1962;

j.  Whether CBL violated Florida's Civil RICO statutes; and

k.  The amount of damage the Class members sustained as a result of CBL's wrongful conduct, and the proper measure of such damage.

## C.  Typicality

35.  Plaintiff's claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of CBL's unlawful conduct. Each Class member has sustained damage as a result of CBL's wrongful conduct in the same manner as the Plaintiff – that is, each Class member was charged in excess of what CBL's actual costs were for electricity, contrary to: (1) the express terms of CBL's uniform lease agreements where CBL agreed to charge its tenants no more than what CBL paid the public utility for that electricity; and (2) applicable law.

010475-11 859854 V1

### D.    Adequacy of Representation

36.    Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it. There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

37.    To prosecute this case, Plaintiff has chosen the law firms of Buckner + Miles, Hagens Berman Sobol Shapiro LLP, and Yormak Employment and Disability Law. These law firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### E.    Requirements of Fed. R. Civ. P. 23(b)(3)

#### 1.    Predominance

38.    The questions of law or fact common to the claims of the Plaintiff and the Class predominate over any questions of law or fact affecting only individual members of the Class. All claims by Plaintiff and the unnamed Class members are based on CBL's deceitful practice of charging its tenants more than what CBL paid the public utility for electricity, in breach of the express terms of the common form lease agreements and applicable state law.

39.    Common issues predominate when, as here, liability can be determined on a Class-wide basis.

40.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in the case at bar, common questions will be held to predominate over individual questions.

41.    Because all claims by Plaintiff and the unnamed Class members are based on the same misconduct by CBL, in particular, that CBL charged its tenants more than what CBL paid

for electricity—in direct contravention of the express terms of the lease agreements and Florida law—the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

**2.   Superiority**

42.   A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

    a.   Joinder of all Class members would create extreme hardship and inconvenience because of their geographical dispersion. Class members reside throughout the United States.

    b.   Individual claims by the Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  CBL is a large, well-funded, and powerful defendant.  Moreover, it has ongoing contractual relationships with many, if not most Class members, which may make some Class members fearful or reluctant to pursue their claims, even if they had the resources to do so. As a result, individual Class members are unable to prosecute and control separate actions.

    c.   The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

    d.   The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

**COUNT I**

**BREACH OF CONTRACT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

43.   Plaintiff re-alleges and incorporates paragraphs 1-42 of this Complaint as if fully set forth herein.

44.   CBL entered into lease agreements with Plaintiff and the Nationwide Class members for the use of the premises owned by CBL, for the purpose of retail sales and related services.

45.   In Plaintiff's and Nationwide Class members' lease agreements, CBL stated with respect to electrical charges that the "Tenant shall not be charged more than the rates it would be

- 13 -

charged for same services if furnished directly to the Leased Premises by the Local Utility Company. . . ." Accordingly, CBL promised Plaintiff and the Nationwide Class that it would not mark up their electrical costs and that Plaintiff and the Nationwide Class would be charged the same amount by CBL for electricity as if they had purchased that electricity directly from the local public utility provider.

46.     CBL also put in the lease agreements provided to Nationwide Class members a provision that in exchange for providing Plaintiff and Nationwide Class members energy at CBL's cost, Nationwide Class members waived their audit rights to review CBL's electric bills. CBL inserted this provision to insulate its illegal conduct from the scrutiny of Plaintiff and the Nationwide Class.

47.     CBL breached the lease agreements with Plaintiff and the Nationwide Class by marking up their electrical costs and charging them more for electricity than CBL actually paid the local public utility provider for that same electricity.

48.     By marking up Plaintiff's and the Nationwide Class members' electrical costs and charging them amounts in excess of what CBL actually paid the public utilities for that same electricity, CBL breached its lease agreements with Plaintiff and Nationwide Class members, resulting in damages to Plaintiff and Nationwide Class members.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## COUNT II

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ON BEHALF OF THE NATIONWIDE CLASS)

49.     Plaintiff re-alleges and incorporates paragraphs 1-42 of this Complaint as if fully set forth herein.

50.     The implied covenant of good faith and fair dealing applies to every contract and relates to an express term of a contract.

51.     The purpose of the implied duty of good faith is to protect the parties' reasonable commercial expectations.  The question arises when one party has a discretionary decision without defined standards.

52.     CBL entered into lease agreements with Plaintiff and the members of the Nationwide Class for the use of premises owned by CBL for the purpose of retail sales and related services.

53.     In Plaintiff's and Nationwide Class members' lease agreements with respect to electric charges, CBL expressly agreed that "Tenant shall not be charged more than the rates it would be charged for same services if furnished directly to the Leased Premises by the Local Utility Company. . . ." Accordingly, CBL promised Plaintiff and Nationwide Class members that it would not mark up their electric costs and that Plaintiff and the Nationwide Class would be charged by CBL the same amount for electricity as if they were purchasing that electricity directly from the local public utility provider.  CBL had an implied duty of good faith to charge the appropriate amount.

54.     CBL also put in the lease agreements a provision that in exchange for providing Plaintiff and Nationwide Class members energy at the actual cost of such energy that they

- 15 -

waived their audit rights to review CBL's electric bills.  CBL inserted this provision to insulate

its illegal conduct from the scrutiny of Plaintiff and the Nationwide Class.

56. By charging Plaintiff and the Class amounts greater than what CBL actually paid

for the electricity, CBL breached the implied covenant of good faith and fair dealing attached to

the terms of the contract.  Accordingly, Plaintiff and Nationwide Class members suffered

damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and

entities, demands judgment against CBL for compensatory damages, pre- and post-judgment

interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court

deems just and proper.

## COUNT III

### UNJUST ENRICHMENT
### (ON BEHALF OF THE NATIONWIDE CLASS)

56. Plaintiff re-alleges and incorporates paragraphs 1-42 as if fully set forth herein.

57. CBL received, and continues to receive, payments for electricity from Nationwide

Class members in excess of what CBL actually paid and pays for that electricity from the local

public utility company.  Instead of charging tenants only for what CBL was charged for

electricity as it promised, CBL charged Plaintiff and the Nationwide Class substantially more for

that electricity, retaining the excess amount as unearned profit for itself.

58. CBL knowingly and wrongfully retained that excess amount for its own benefit.

Accordingly, CBL received benefits that it unjustly retained at the expense of Plaintiff and

Nationwide Class members. Moreover, CBL prevented Plaintiff and the Nationwide Class from

learning that they were being charged in excess of the actual costs for electricity because CBL

010475-11 859854 V1

provided them with inflated energy surveys and would not turn over to Plaintiff and members of the Nationwide Class the actual electric bills.

59.     The circumstances are such that it would be inequitable to allow CBL to retain the payments it collected from Plaintiff and the Nationwide Class members that were in excess of what CBL paid the local public utilities for that same electricity.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

### COUNT IV

### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(A), (C)-(D)) (ON BEHALF OF THE NATIONWIDE CLASS)

60.     Plaintiff re-alleges and incorporates paragraphs 1-42 as if fully set forth herein.

61.     Plaintiff brings this Count on behalf of a Nationwide Class against CBL.  CBL is a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

62.     Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

63.     Section 1962(c) makes it "unlawful for any person employed by or associated
with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,
to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through
a pattern of racketeering activity." 18 U.S.C. § 1962(c).

64.     Section 1962(d) makes it unlawful for "any person to conspire to violate"
Sections 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

65.     For many years, CBL sought to illegally increase its profits by wrongfully
inflating the cost of electricity to its tenants. CBL was employed by and associated with an
illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of
racketeering activity consisting of numerous and repeated uses of the interstate mail and wire
facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(a), (c)-(d).
These acts, committed by interstate wire and through the mails, include: (1) sending and
receiving thousands of lease agreements that contained representations that limited the electric
charges to tenants to the amount charged by the local electrical utility, that CBL intended to and
did violate; (2) sending thousands of invoices to tenants that falsely represented a charge for
energy that was in fact inflated; and (3) receiving inflated energy charge payments.

66.     CBL handsomely profited from the enterprise and Plaintiff and the Nationwide
Class members suffered because the enterprise significantly increased the amounts paid for
electricity by Plaintiff and the Nationwide Class and received by CBL.

67.     CBL also conspired with Valquest, an energy company that, among other things,
conducts energy surveys, that were used to defraud Plaintiff and the Nationwide Class. CBL
contracted with Valquest to provide false electrical surveys and audits to Plaintiff and the

010475-11  859854 V1

Nationwide Class when Class members complained about the electrical costs charged by CBL, in order to falsely justify and conceal the inflated electrical charges.

68.     Valquest knowingly and intentionally assisted CBL and helped it to defraud Plaintiff and the Nationwide Class by obtaining money through a series of fraudulent misrepresentations and acts.  The association was structured by contracts between and among the participants.  CBL had a contract with Valquest under which Valquest agreed to provide energy surveys to CBL's tenants in exchange for payments from CBL.

69.     The RICO enterprise, which CBL engaged in, and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities including CBL, Valquest, and other unnamed co-conspirators.  CBL and Valquest conspired to defraud Plaintiff and the Nationwide Class that rented space at CBL shopping centers.  Specifically, CBL put in its standard and uniform lease agreements a representation that it would not mark up the electricity costs it charged its tenants. However, CBL marked up the electricity costs it charged the Plaintiff and the Class in excess of what CBL paid for that electricity from the local public utility provider.

70.     CBL attempted to shield itself from scrutiny by including in the lease agreements an audit waiver provisions that required the Plaintiff and the Class to waive their right to audit CBL's electric bills.

71.     When tenants complained about the electricity charges, CBL conspired with Valquest to provide Plaintiff and the Nationwide Class with inflated energy audits and surveys to justify the marked up electric charges.  Valquest's so-called energy audits were nothing more than a sham used to justify CBL's mark up of electrical charges and to help hide CBL's illegal conduct from Plaintiff and the Class.

- 19 -

72.     The members of the RICO enterprise all share a common purpose: to enrich themselves at Nationwide Class members' expense by maximizing the revenues of CBL through fraudulently inducing Plaintiff and the Nationwide Class to pay more for electricity than represented to them in the lease agreements through a scheme that used inflated energy audits to help justify the marked up electric charges.  CBL increased its profits and Valquest benefitted because it was compensated by CBL for providing the inflated energy audits to Plaintiff and Nationwide Class members.   CBL and Valquest shared the bounty of their criminal enterprise, *i.e.,* by sharing the overpayments for electrical charges generated by the joint scheme to defraud the Plaintiff and the Class members.

73.     This RICO enterprise has existed for more than six years and continues to exist and operates pursuant to certain agreements entered into between and among CBL, Valquest, and other unnamed co-conspirators.  The RICO enterprise has functioned as a continuing unit and has and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

74.     CBL conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Plaintiff has attached a standard form lease agreement (Ex. A), monthly invoices (Ex. B), and an energy audit (Ex. C) representing the continuity of the Defendant's conduct over multiple years and on a monthly basis, representing more than nineteen separate and distinct examples of mail and wire fraud. Thus, Plaintiff has demonstrated the continuity of CBL's conduct over a fixed period of time.  Furthermore, CBL continues to engage in these predicate acts and to harm

the Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of CBL's open-ended pattern of racketeering activity.

75.     CBL received payment for the marked up electric charges from Plaintiff and the Nationwide Class members through the United States Postal Service and interstate wire facilities in violation of 18 U.S.C. §§ 1341 and 1343.  In furtherance of the scheme, CBL committed thousands of separate mail and wire fraud violations on a monthly basis over more than six years through the transmission of its standard form lease agreements, invoices, and energy audits, each one constituting its own separate and distinct predicate act.  Each of these violations was related because they shared the common purpose of defrauding Plaintiff and the Nationwide Class by overcharging them for electricity in direct contravention of the express representations of the lease agreement.  CBL also transferred between and among, and received sums from, Plaintiff and the Nationwide Class, Valquest, and other unnamed co-conspirators, including but not limited to the marked up electricity costs, in furtherance of its scheme to defraud Plaintiff and Nationwide Class members in violation of 18 U.S.C. § 1343.

76.     These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

77.     CBL had the specific intent to participate in the overall RICO enterprise, which was evidenced by its scheme to defraud Plaintiff and the Nationwide Class.  CBL's scheme was reasonably calculated to deceive Plaintiff and Nationwide Class members, all of whom are of ordinary prudence and comprehension, through the execution of its complex and illegal mark up of electricity charges scheme. Plaintiff and Nationwide Class members relied on the uniform misrepresentations in CBL's standard lease agreements that it would not charge more for

- 21 -

electricity than if the electricity was purchased directly from the local public utility provider. Plaintiff and the Nationwide Class relied on the uniform misrepresentations in the lease agreements and the invoices believing that they accurately reflected the actual electric costs as required under the standard lease agreements.  Plaintiff and the Nationwide Class relied on the invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

78.     CBL received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce.  Furthermore, CBL used and invested the income it received through its pattern of racketeering activity to operate its business, which caused Plaintiff and the Nationwide Class members to suffer damages.  The investment of the marked up electricity profits obtained through CBL's deception in its standard lease agreements enabled CBL to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and Nationwide Class members on an ongoing basis.  In so doing, CBL violated Section 1962(a).

79.     CBL conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Specifically, CBL's lease agreements contained uniform misrepresentations that CBL would not charge the Plaintiff and the Class more for electricity than if the Plaintiff and the Class were purchasing that electricity directly from the local public utility provider.  CBL's invoices continued the deception by itemizing the cost for electricity when, in fact, that cost was inflated and represented profit to CBL. Plaintiff and the Nationwide Class, all of whom were of ordinary prudence and comprehension, relied on the uniform misrepresentations in the lease agreements and the invoices, believing that they accurately reflected the actual electric costs as required under the standard lease agreements.  Further, CBL

contractually barred audits which would have uncovered the scheme, instead only providing false audits produced by Valquest. Plaintiff and the Nationwide Class relied on CBL's invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

80.    CBL, Valquest, and other unnamed co-conspirators, as noted above, conspired to violate sections 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

81.    By reason, and as a result thereof, CBL's conduct and participation in the racketeering activity described herein has caused Plaintiff and the Nationwide Class to directly incur damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

<h3 style="text-align:center">COUNT V</h3>

<h3 style="text-align:center">VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT<br>(ON BEHALF OF THE FLORIDA STATUTORY CLASS)</h3>

82.    Plaintiff re-alleges and incorporates paragraphs 1-42 as if fully set forth herein.

83.    This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

84.    At all times material, Plaintiff and all members of the Florida Statutory Class were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA in accordance with Section 501.211, Fla. Stat.

85.    At all times material, CBL conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

86.     CBL has engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

87.     The concealment and omissions of material facts and misrepresentations and deceptions alleged in the preceding paragraphs occurred in connection with CBL's trade and commerce in Florida.

88.     CBL's unfair and deceptive acts and practices violate FDUTPA, Section 501.201 and 501.211, Fla. Stat.

89.     As a direct and proximate result of CBL's FDUTPA violations, Plaintiff and the Florida Statutory Class have been damaged in an amount to be proven at trial.

90.     Plaintiff and the Florida Statutory Class are entitled to actual damages, attorneys' fees and costs, and all other remedies available under FDUTPA.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

### COUNT VI

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT – *PER SE* VIOLATION (ON BEHALF OF THE FLORIDA STATUTORY CLASS)

91.     Plaintiff re-alleges and incorporates paragraphs 1-42 as if fully set forth herein.

92.     This Count is brought pursuant to FDUTPA.

93.     Section 501.203(3)(c) of the Florida Statutes provides that a violation of any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts is a violation of FDUTPA.

- 24 -

94.     The Florida Administrative Code is a series of rules and regulations that proscribes such unfair, deceptive, or misleading business practices.  CBL violated and conspired to violate, and aided and abetted others in the violation of, Fla. Admin. Code 25-6.049, which states among other things, "[a]ny fees or charges collected by a customer of record for electricity billed to the customer's account by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity."  CBL violated Fla. Admin. Code 25-6.049 by charging Plaintiff and the Florida Statutory Class more for electricity than what CBL actually paid for that same electricity from the local public utility company.

95.     Therefore, Defendant's violations of the Florida Administrative Code constitute an independent violation of FDUTPA.

96.     Plaintiff and the Florida Statutory Class are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs, and all other remedies available under FDUTPA.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

### COUNT VII

**VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT, FLA. STAT.  §§ 772.103, 772.104(1), 777.011, AND 777.03(1)(A) (ON BEHALF OF THE FLORIDA STATUTORY CLASS)**

97.     Plaintiff re-alleges paragraphs 1-42 as if fully set forth herein.

98.     As described above, CBL, Valquest, and other un-named co-conspirators, were associated in an enterprise and conspired, aided and abetted and agreed to conduct and

- 25 -

participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of Fla. Stat. §§ 772.103, 772.104(1), 777.011, and 777.03(1)(a).

99.     In furtherance of its scheme, CBL engaged in thousands of acts of mail and wire fraud for more than six years in violation of federal law, as set forth above, and Fla. Stat. § 817.034.

100.    CBL violated and conspired to violate, and aided and abetted others in the violation of, Fla. Admin. Code 25-6.049, which states among other things, "[a]ny fees or charges collected by a customer of record for electricity billed to the customer's account by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity." CBL was a customer and received electricity from various Florida public utility companies. CBL, in violation of Fla. Admin. Code 25-6.049, charged Plaintiff and the Florida Statutory Class more for electricity than what CBL actually paid for that same electricity as billed by the local public utility company.

101.    CBL has engaged in a pattern of racketeering activity and engaged in more than two incidents of racketeering or racketeering conduct that has the same or similar intents, results, accomplices, victims, or methods of commission, and that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

102.    Plaintiff has attached a standard lease agreement (Ex. A), monthly invoices (Ex. B), and an energy survey (Ex. C), that represent the continuity of Defendant's conduct over multiple years and on a monthly basis and are nineteen separate and distinct examples of mail and wire fraud violations. Thus, Plaintiff has demonstrated the continuity of CBL's conduct over

- 26 -

a fixed period of time.  Furthermore, CBL continues to engage in these predicate acts and harm

Florida Statutory Class members on a daily basis, which establishes a threat of long-term

racketeering activity and evidences the continuity of CBL's open-ended pattern of racketeering

activity.

103.    CBL used and invested the income it received through its pattern of racketeering

activity to operate its business which caused Plaintiff and Florida Statutory Class members to

suffer direct damages.  The investment of the marked up energy costs obtained by CBL through

its illegal resale of energy in Florida to Plaintiff and Florida Statutory Class members enabled

CBL to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and Florida

Statutory Class members.

104.    By reason, and as a result thereof, CBL's conduct and participation in the

racketeering activity described herein directly caused Plaintiff and Florida Statutory Class

members to incur significant and substantial damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and

entities, demands judgment against CBL for compensatory and treble damages, pre- and post-

judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the

Court deems just and proper.

### COUNT VIII

### VIOLATION OF FLORIDA'S ADMINISTRATIVE CODE 25-6.049
### (ON BEHALF OF THE FLORIDA STATUTORY CLASS)

105.    Plaintiff re-alleges paragraphs 1-42 as if fully set forth herein.

106.    As described above, CBL violated and conspired to violate, and aided and abetted

others in the violation of, Fla. Admin. Code 25-6.049, which states among other things, "[a]ny

fees or charges collected by a customer of record for electricity billed to the customer's account

- 27 -

by the utility, whether based on the use of sub-metering or any other allocation method, shall be determined in a manner which reimburses the customer of record for no more than the customer's actual cost of electricity."

107.     CBL was a customer and received electricity from various Florida public utility companies.

108.     CBL, in violation of Fla. Admin. Code 25-6.049, charged Plaintiff and the Florida Statutory Class more for electricity than what CBL actually paid for that same electricity as billed by the local public utility company.

109.     As a result of CBL's conduct, Plaintiff and Florida Statutory Class members have incurred significant and substantial damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL for compensatory, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

A.     Certify this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3); appoint Plaintiff the representative of the Nationwide Class and Florida Statutory Subclass; and appoint Buckner + Miles, Hagens Berman Sobol Shapiro LLP, and Yormak Employment and Disability Law as Class Counsel.

B.     Award Plaintiff and the Class all common law, compensatory, and special damages as well as restitution and statutory remedies for CBL's violations of law and breaches of contract, including pre- and post-judgment interest on these amounts.

C.     Award Plaintiff and the Class treble damages.

- 28 -

D.    Award Plaintiff and the Class their attorney's fees, costs, and expenses.

E.    Award Plaintiff and the Class such further relief as is appropriate in the interests

of justice.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by

law.

DATED: March 16, 2016                    Respectfully submitted,

By
Benjamin H. Yormak, Esq., FBN 71272
YORMAK EMPLOYMENT & DISABILITY LAW
99900 Coconut Road
Bonita Springs, Florida 34135
Telephone: 239.985.9691
E-mail: byormak@yormaklaw.com

David M. Buckner, Esq., FBN 60550
Seth E. Miles, Esq., FBN 385530
Brett E. von Borke, Esq., FBN 0044802
3350 Mary Street
Coconut Grove, Florida 33133
Telephone: 305.964.8003
E-mail: david@bucknermiles.com
E-mail: seth@bucknermiles.com
E-mail: vonborke@bucknermiles.com

Steve W. Berman (*pro hac vice to be filed*)
Thomas E. Loeser (*pro hac vice to be filed*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone:  206.623.7292
Facsimile:  206.623.0594
E-mail: steve@hbsslaw.com
E-mail: toml@hbsslaw.com

*Counsel for Plaintiff and the Proposed Classes*

010475-11 859854 V1