UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| WAVE LENGTHS HAIR SALON OF FLORIDA, INC., d/b/a/ SALON ADRIAN, on behalf of itself and all others similarly situated, | Case No. 2:16-cv-00206-SPC-MRM _____ |
| Plaintiffs, | |
| v. | |
| CBL & ASSOCIATES PROPERTIES, INC., CBL & ASSOCIATES MANAGEMENT, INC., CBL & ASSOCIATES LIMITED PARTNERSHIP and JG GULF COAST TOWN CENTER LLC, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

## I.      INTRODUCTION

1.      When a landlord rents mall space to small businesses, it must follow state laws and regulations that forbid turning providing utilities into a profit center for secret excess rent. Likewise, when a mall landlord promises a tenant in written contract that it will not mark-up electricity, it must honor that contractual obligation.  But CBL & Associates Properties, Inc. ("CBL"), broke these basic rules.  Through a pernicious shell game of corporate entities, CBL for years executed a fraudulent scheme through a criminal enterprise to overcharge small business tenants for electricity at all of its shopping malls throughout the United States.

2.      CBL conducts its business through CBL & Associates Limited Partnership ("CBL Partnership") and CBL Partnership owns all of the common and preferred stock of CBL & Associates Management, Inc. ("CBL Management").  CBL Management is responsible for managing nearly all of CBL's shopping malls nationwide.  CBL creates single purpose entities to

own the shopping malls and places those single purpose entities into holding companies owned by CBL Partnership, with the vast majority of profits and revenues flowing back to CBL from those operations. CBL Management manages and conducts all the business activities of those single purpose entities.

3.     CBL directed and required CBL Management to use standard lease agreements that falsely represented that the tenants at the shopping malls it ultimately owned would be charged the amount that the shopping malls were charged by the local utility providers to supply those tenants with electricity.  That is, CBL Partnership, at the direction and behest of CBL, caused CBL Management to represent to the tenants that the tenants would pay the same amount for electricity that the tenants would pay if they were purchasing the electricity directly from the local utility. Despite the contractual obligations and representations, CBL, CBL Partnership, CBL Management, and other unnamed co-conspirators engaged in a racketeering enterprise and conspiracy, breached the lease agreements with tenants, and violated applicable state laws and regulations by inflating the tenants' electric bills.  Sometimes, the fraudulent and illegal markups exceeded 100% of the tenant's actual electricity usage charges.

4.     In an effort to conceal its wrongful and illegal conduct, CBL caused CBL Management to insert into the lease agreements a clause requiring the tenants at the shopping malls, ultimately owned and controlled by CBL through its holding companies, to waive their right to audit the shopping malls' electric bills in exchange for agreeing that the electricity charges would not be marked-up.  Whenever tenants raised issues about their electricity costs, CBL caused CBL Management to inform the tenants that they had waived their audit rights under the lease agreement and instructed CBL Management not to provide the tenants with the actual electricity bills from the utilities, which would have revealed the undisclosed mark-ups.

5.      In furtherance of its fraudulent and illegal scheme, CBL had Valquest, an independent third-party energy company, provide its customers with inflated energy surveys to justify the marked-up electrical charges.  CBL's scheme allowed it to take advantage of the tenants by: (1) fraudulently misrepresenting to them that their electricity charges were not being marked-up; (2) actually having the electrical charges marked-up in contravention of the lease agreement; and (3) covering up that illegal conduct by using the audit waiver provision to shield it from scrutiny. CBL knew it was much bigger, and much better financed than the thousands of small business owners nationwide who rented mall spaces from it.  In exploiting this inequality, CBL used its vast resources and superior negotiating and bargaining power to actively victimize and defraud tenants – simply to reap unfair, improper, and illegal profits.

6.      CBL's scheme was fully unmasked when the Gulf Coast Town Center ("GCTC") in Ft. Myers, Florida – that CBL owned through a single purpose entity, JG Gulf Coast Town Center LLC ("JG Gulf Coast") –  which was managed by CBL Management, went into foreclosure and was taken over by the lender.  As a result, a third-party management company was brought in to manage GCTC.  The management company performed a utility usage evaluation at the mall.  It became immediately apparent that the tenants at GCTC had been significantly overcharged for electricity.  Not wanting any part of CBL's illicit scheme, the new management company immediately reduced the bills for the tenants at GCTC to match the actual electric utility charges.

7.      Plaintiff Wave Lengths Hair Salon of Florida, Inc., d/b/a/ Salon Adrian ("Salon Adrian") was and is a tenant at GCTC.  For years CBL, through CBL Partnership, caused CBL Management and JG Gulf Coast to lie to Salon Adrian by telling Salon Adrian that it was only paying its share of the actual electricity charges at GCTC.  In truth, for years Salon Adrian was tricked into paying thousands of dollars in illicit electricity mark-ups, the vast majority of which

were ultimately paid to CBL.  Salon Adrian brings this class action lawsuit on behalf of itself and all other similarly situated current and former tenants to: (1) end CBL's illegal conduct; (2) require that the terms of the lease agreements be honored by charging the tenants at the shopping malls that CBL owns through its holding companies their actual electricity costs going forward; and (3) return to current and former tenants the illegal electricity mark-ups that were charged to them and retained for years on end, as well as appropriate damages, interest, and penalties as permitted under the applicable statutes.

## II.    PARTIES

8.    Plaintiff Wave Lengths Hair Salon of Florida, Inc., d/b/a/ Salon Adrian ("Salon Adrian") is incorporated under the laws of Florida and has its principal place of business in Florida. Salon Adrian is an upscale hair and nail salon located at GCTC, an outdoor shopping mall located in Fort Myers, Florida.  Salon Adrian signed a 10-year lease with JG Gulf Coast for its location at GCTC on June 13, 2006, which CBL Management signed on JG Gulf Coast's behalf.  (Salon Adrian Lease, Ex. A).  During its lease, Salon Adrian regularly received invoices through the United States mail for its electric costs, sometimes directly from CBL and other times from CBL Management, which Salon Adrian believed were the amounts charged by the local utility without any mark-up because of the representations contained in the lease agreement. Salon Adrian paid the full amount of those invoices to either CBL or CBL Management depending on who sent the invoice.

9.    CBL is a Real Estate Investment Trust ("REIT") headquartered in Chattanooga, Tennessee, has its principal place of business in Tennessee, and is incorporated under the laws of Delaware.  CBL was organized on July 13, 1993, as a Delaware corporation, to acquire substantially all of the real estate properties owned by CBL & Associates, Inc., which was formed by Charles B. Lebovitz in 1978.  On November 3, 1993, CBL completed an initial public offering.

CBL is one of the largest shopping center REITs in the United States and owns, holds interests in, or manages 150 properties, including 88 market dominant enclosed malls and open-air centers. CBL operates in twenty-seven states but is primarily focused in the Southeastern and Midwestern portions of the United States.  CBL's total assets were valued at approximately $6.5 billion in the 2015 fiscal year.

10.    CBL & Associates Limited Partnership ("CBL Partnership") was created simultaneously with the public offering of CBL and certain of CBL & Associates, Inc.'s, shareholders, affiliates, and senior officers, transferred substantially all of their interests in their real estate properties to CBL Partnership in exchange for common units of limited partner interests in the operating partnership.  CBL Partnership is incorporated under the laws of Delaware and has its principal place of business and is headquartered in Chattanooga, Tennessee.

11.    CBL & Associates Management, Inc. ("CBL Management") is incorporated under the laws of Delaware and is headquartered and has its principal place of business in Chattanooga, Tennessee.  CBL Partnership owns 100% of CBL Management's outstanding preferred and common stock.  CBL, through CBL Partnership, uses CBL Management to conduct its property management and development activities nationwide.  CBL Management manages all but nine of CBL's shopping malls and was responsible for managing GCTC.

12.    CBL's revenues are primarily derived from leases with retail tenants and generally include fixed minimum rents, percentages of rents based on tenants' sales volumes, and reimbursements from tenants for expenditures related to real estate taxes, insurance, common area maintenance, electrical charges, and other recoverable operating expenses, as well as certain capital expenditures.  CBL also generates revenues from management, leasing and development fees, sponsorships, sales of peripheral land at its properties and from sales of its real estate assets.

The vast majority of the revenues and profits from CBL Partnership, CBL Management, and the single purpose entities held in CBL Holdings I and II, flow directly back to CBL.

13.     JG Gulf Coast Town Center LLC ("JG Gulf Coast") is an Ohio limited liability company with its principal place of business in Chattanooga, Tennessee.  JG Gulf Coast owned GCTC until 2015, when it defaulted on its loan with its lender and the lender foreclosed on GCTC. JG Gulf Coast was designated as the landlord on the standard GCTC lease agreements.  However, CBL Management signed, on JG Gulf Coast's behalf, the lease rental agreement that JG Gulf Coast entered into with the tenants at GCTC.

### III.     JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a), because this is an action for an amount exceeding $5,000,000, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than all of the Defendants.  Subject matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961 *et seq*.  The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d), and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

15.     This Court also has personal jurisdiction over the Defendants, because they continuously and systematically operate, conduct, engage in, and carry on business in Florida by owning, managing, and operating at least five retail shopping centers in Florida.  The Court also has specific personal jurisdiction over the Defendants because the Defendants wrongful conduct at issue in this lawsuit occurred in Lee County, Florida.  Accordingly, the Defendants are subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Salon Adrian's causes of action accrued within this judicial district and a substantial part of the events,

acts, and omissions giving rise to Salon Adrian's claim occurred here.  Furthermore, Salon Adrian is a Florida corporation and its principal place of business is in this district, the Defendants routinely operate and solicit business in this district, and the Defendants' wrongful acts in this district have impacted the general public of this district.

## IV.     FACTUAL ALLEGATIONS

**A.     Salon Adrian Entered Into A Lease With JG Gulf Coast To Rent Retail Space At The Gulf Coast Town Center.**

17.     CBL through CBL Partnership, created a single purpose entity, JG Gulf Coast, to purchase GCTC, which is a retail shopping center featuring over ninety different stores and eateries located in Fort Myers, Florida.  CBL caused CBL Partnership to hold JG Gulf Coast in one of its holding companies.  GCTC was managed exclusively by CBL Management, which acted as JG Gulf Coast's agent in executing leases, managing the shopping mall, and conducting all other related functions at GCTC.

18.     Salon Adrian is owned and operated by Adrian Jerne Church.  Ms. Church has worked in the cosmetology business for most of her life – more than forty years.  Ms. Church has owned various salons and has operated cosmetology schools training countless cosmetologists. Ms. Church opened Salon Adrian, the second salon that she owned at the time, in GCTC in 2006. While the rent at GCTC was substantially more expensive than the rent at her other location, she hoped that the location would increase her sales and allow her business to grow.

19.     On June 13, 2006, Salon Adrian and JG Gulf Coast, with CBL Management signing as the agent for JG Gulf Coast, entered into a long-term 10-year lease agreement for a retail space at GCTC.  (Attached as Exhibit A).  The leased premises were to be used and operated as a hair and nail salon.

20.     Among the various provisions in Salon Adrian's lease agreement was the

following:

> Section 2.5 Utilities Charges. (a) Tenant shall pay promptly, as and
> when the same become due and payable, all water rents, rates and
> charges, all sewer rents and all charges for electricity, gas, heat,
> steam, hot and/or chilled water, air conditioning, ventilating,
> lighting systems, and other utilities supplied to the Leased Premises.
> If any such utilities are not separately metered or assessed or are
> only partially separately metered or associated and are used in
> common with other tenants in the Shopping Center, Tenant will pay
> to Landlord a proportionate share of such charges, in addition to
> Tenant's payments of the separately metered charges.  Landlord
> may install registering meters and collect any and all charges
> aforesaid from Tenant, making returns to the proper utility company
> or government unit, **provided that Tenant shall not be charged
> more than the rates it would be charged for same services if
> furnished directly to the Leased Premises by the Local Utility
> Company,** as hereinafter defined.

(Ex. A at § 2.5) (emphasis added).

21.     Furthermore, Rider A to the lease agreement stated "[r]egardless of whether the

Electrical Charge is determined by method 1 or 2 above, the rate segment of the Electrical Charge

shall not exceed the rate (including taxes) which Tenant as the operator of a separately metered

and billable facility would otherwise pay for continuous comparable service to the applicable

municipality, governmental authority or utility company located in and serving retail facilities of

a size and with the same requirements as Tenant's in the geographic location of the Shopping

Center ("Local Utility Company") if such electrical energy were not supplied by Landlord and had

Tenant purchased such electricity directly from the Local Utility Company."

(*Id.* at Rider A).

22.     CBL, acting through CBL Partnership, caused CBL Management and JG Gulf

Coast to put § 2.5 and Rider A into the lease agreements that were used at GCTC.  Pursuant to §

2.5 and Rider A of the lease agreement, JG Gulf Coast uniformly promised Plaintiff and every

tenant at GCTC that they would be charged the same for their electricity as if they were being billed directly by the local utility company.  Accordingly, the tenants were to receive their electricity at the cost paid by JG Gulf Coast at GCTC without any additional mark-up.  These representations and practices were repeated at CBL malls around the country in a materially uniform manner.

23.    CBL, acting through CBL Partnership, caused CBL Management and JG Gulf Coast to also insert an audit waiver provision in the lease agreement requiring the tenants at GCTC to waive any right to audit the invoices and records to determine whether they were actually being charged the correct amount for electricity.  Pursuant to § 12.24 of the lease agreement, "Tenant hereby waives any and all legal and equitable rights it has or may have to inspect and/or audit Landlord's records and contracts relating to Tenant's charges under the terms of this Lease . . . ." (Ex. A at § 12.24).  This practice was repeated at CBL malls around the country in a materially uniform manner.

**B.    Salon Adrian Attempts To Mitigate Its Exorbitant Electrical Charges.**

24.    Shortly after Salon Adrian opened its location at GCTC, it began receiving as part of its monthly invoice through the U.S. mail, sometimes directly from CBL and sometimes from CBL Management, a line item cost for electricity.  (*See* Salon Adrian's Invoices, attached as Exhibit B). Salon Adrian's energy bills averaged over $500 per month, but sometimes CBL and CBL Management, depending on who sent the invoice through the U.S. mail, would bill as much as $600 or $700 per month, which was substantially more than Salon Adrian paid for electricity at its other location to operate the same type of business.

25.    While Ms. Church directed Salon Adrian to take on additional costs in the form of increased rent in hopes of growing her business, the economy of the United States entered into what would be known as the Great Recession.  Florida and the Fort Myers area where Salon Adrian

is located were particularly hard hit because of the collapse of the housing market and the loss of the associated jobs related to that sector of the economy.  Almost immediately after taking on the additional costs of renting at GCTC, Salon Adrian began to see a substantial drop in its revenue.

26.     Salon Adrian struggled over the next few years as the Great Recession continued to decimate the local and national economy.  Customers stopped coming altogether or would lengthen the time between appointments.  And when the customers did come, they purchased fewer services.  During this time, Salon Adrian did everything it could to cut costs in order to stave off bankruptcy.

27.     Other than Salon Adrian's rent, one of its largest business expenses is electricity.  Ms. Church believed Salon Adrian was being charged electricity based on its actual consumption without any mark-up.  Thus, Ms. Church believed Salon Adrian could substantially reduce its electrical costs by taking on additional debt to purchase state of the art high efficiency lightbulbs and other products.  Salon Adrian spent thousands of dollars to upgrade all of the lights at its location with energy efficient LED lightbulbs.  Salon Adrian also upgraded its appliances and replaced them with new ones with the highest energy efficiencies in order to achieve maximum energy cost savings.

28.     Despite those efforts and the thousands of dollars invested in energy efficient lightbulbs and appliances, there was no corresponding reduction in Salon Adrian's electric bill.  In fact, after the upgrades were made, Salon Adrian's energy bills actually increased to more than $600 a month on average.

**C.     CBL Conspired With Valquest To Inflate Salon Adrian's And Other Inquiring Tenants' Energy Surveys.**

29.     Valquest Systems, Inc. ("Valquest"), is an energy company based in Texas that, among other things, conducts and provides energy surveys and audits.  CBL contracted with

Valquest to provide tenants at the various shopping malls that were owned by CBL through its holding companies with energy surveys that were used to project energy costs for a storefront location or to substantiate the energy costs that either CBL Management or CBL billed and sent to the tenants when the tenants questioned those amounts.

30.     Sometime in the first quarter of 2004, CBL entered into an agreement and conspired with Valquest and directed Valquest to artificially inflate the amount of the electricity costs in the energy surveys provided to the tenants that rented space at malls that were owned by CBL through its holding companies.  Valquest artificially inflated the electricity costs in return for the payments it received from CBL for conducting the falsified energy surveys.  CBL and Valquest knew the Valquest surveys were inaccurate because they inflated the tenants' electricity costs and CBL knew what the true costs were.

31.     For example, Salon Adrian complained to CBL Management about its electricity costs increasing in 2009 after it made upgrades to energy efficient products.  On May 20, 2009, CBL paid Valquest and Valquest agreed to provide Salon Adrian with an energy survey that overstated Salon Adrian's electricity usage and costs in order to substantiate the marked-up electrical charges.  (See Valquest Energy Audit, attached as Exhibit C).  CBL used the inflated energy survey to hide its illegal conduct and the illegal conduct of its co-conspirators Valquest, CBL Partnership, CBL Management, JG Gulf Coast, and the single purpose entities it created to own its shopping malls.  CBL directly profited from the illegal conduct by knowingly and intentionally marking up Salon Adrian's electricity charges and also by causing CBL Management to knowingly and intentionally mark-up Salon Adrian's electrical charges.  CBL shared those illicit profits with Valquest by paying Valquest's fees for the surveys, even though it knew and intended those surveys to be inaccurate.

**D.      CBL's Fraud Is Revealed At Gulf Coast Town Center.**

32.     In September 2015, Wells Fargo Bank sued the single purpose entity CBL created to own GCTC, JG Gulf Coast, for defaulting on its $190.8 million mortgage loan that it took out to purchase GCTC.  As a result of JG Gulf Coast's default on the mortgage loan, Wells Fargo took possession of GCTC, fired CBL Management, and hired a new management company unaffiliated with CBL to operate GCTC.

33.     The new operator performed an electricity usage evaluation of the entire mall and discovered that CBL, CBL Partnership, CBL Management, and JG Gulf Coast had been substantially overcharging the tenants at GCTC for electricity.

34.     On January 27, 2016, the new operator informed Salon Adrian that its energy charge, which was averaging over $600 per month while CBL Management managed GCTC, would be reduced to $269 a month—revealing a shocking 123% mark-up of Salon Adrian's actual electricity usage charges.  (See Letter to Salon Adrian, attached as Exhibit D).

**E.      CBL Overcharges Tenants Nationwide At The Malls It Owns Through Holding Companies.**

35.     CBL's practice of overcharging the tenants at the malls it owns through its holding companies for electricity is not isolated to GCTC.  CBL has a nationwide policy and practice of charging the tenants that rent space at the shopping malls it owns through its holding companies in excess of their actual costs for electricity, irrespective of the standard and uniform written contracts that it causes CBL Management to provide to the tenants and of the laws of the states in which CBL operates.

36.     CBL, acting through CBL Partnership, creates single purpose entities to purchase the shopping centers that are held in CBL Holdings I and II.  CBL then causes CBL Partnership to hire CBL Management to operate all but nine of those shopping centers.  CBL, acting through

CBL Partnership, causes CBL Management and the single purpose entities that own the shopping malls, to insert the equivalent of § 2.5 into each and every lease rental agreement used with the tenants that rent space at their malls.  As noted above, § 2.5 uniformly states that:

> **Tenant shall not be charged more than the rates it would be charged for same services if furnished directly to the Leased Premises by the Local Utility Company,** as hereinafter defined.

(Ex. A at § 2.5) (emphasis added).

37.     Thus, at every mall that CBL owns through its holding companies, they use the same uniform and standard lease agreement that promises the tenants that they would be charged the same for their electricity as if they were being billed directly by the local utility company. Accordingly, the tenants at every shopping mall owned by CBL through its holding companies were to receive their electricity at the cost the shopping mall incurred without any additional mark-up.

38.     Similarly, and as described above, CBL, acting through CBL Partnership, caused CBL Management and the single purpose entities that nominally owned the shopping malls held in the holding companies, to insert an audit waiver provision in the lease agreement requiring the tenants at all of those shopping malls to waive any right to audit the invoices and records to determine whether they were actually being charged the correct amount for electricity.  Pursuant to § 12.24 or its equivalent of the standard lease agreements, "Tenant hereby waives any and all legal and equitable rights it has or may have to inspect and/or audit Landlord's records and contracts relating to Tenant's charges under the terms of this Lease . . . ."  (Ex. A at § 12.24).

39.     CBL's conspiracy with Valquest was uniform and nationwide. CBL directly profited from the illegal conduct by knowingly and intentionally causing CBL Management and its single purpose entities, to mark-up the tenants' electrical charges at the malls CBL owned

through its holding companies.  CBL shared those illicit profits with Valquest by paying Valquest's fees for surveys, even though it knew and intended those surveys to be inaccurate.

40.    Despite the lease rental agreements' promise to charge the tenants at the malls CBL owned through its holding companies no more than what the malls paid for electricity, CBL, through CBL Partnership, caused CBL Management and the single purpose entities to charge the tenants more for electricity than what the malls actually paid the local utility companies for that electricity.  Accordingly, due to CBL's deceitful practice which resulted in the breach of the lease agreements, the tenants at the malls CBL owns through its holding companies suffered significant and substantial damages in excess of $100,000,000.

## V.    CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action against Defendants pursuant to Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, on behalf of itself and all other persons and entities similarly situated.  Plaintiff seeks certification of the following classes (referred to collectively as the "Class"):

**The Nationwide Class**

All individuals and entities that entered into lease agreements at shopping malls managed by CBL & Associates Management, Inc., that contained a provision that stated that electricity would not be marked-up or inflated and who paid for electricity in connection with such agreements within the applicable limitations period.

Excluded from the Nationwide Class are CBL, CBL Partnership, CBL Management, CBL Holdings I, CBL Holdings II, and JG Gulf Coast and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

**The Florida Statutory Class**

All individuals and entities that entered into lease agreements at shopping malls managed by CBL & Associates Management, Inc., in Florida that contained a provision that stated that electricity would not be marked-up or inflated and who paid for electricity in connection with such agreements within the applicable limitations period.

Excluded from the Florida Statutory Class are CBL, CBL Partnership, CBL Management, CBL Holdings I, CBL Holdings II, and JG Gulf Coast and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

**The GCTC Class**

All individuals and entities that entered into lease agreements at Gulf Coast Town Center with JG Gulf Coast that contained a provision that stated the electricity would not be marked-up or inflated and who paid for electricity in connection with such agreements within the applicable limitations period.

Excluded from the GCTC Class are CBL, CBL Partnership, CBL Management, CBL Holdings I, CBL Holdings II, and JG Gulf Coast and their affiliates and related companies, their directors, corporate officers, and their immediate family members, and any government entity.

## A.    Numerosity

42.    The Nationwide Class consists of hundreds of thousands of current and former tenants who entered into lease agreements at shopping malls managed by CBL Management and ultimately owned by CBL through its holding companies for the purpose of using the premises for retail activities and related services.  The Florida Statutory Class consists of tens of thousands of current and former tenants at malls managed by CBL Management in Florida who were charged more than their actual electricity costs for their electricity use at those malls.  Finally, the GCTC Class consists of hundreds of current and former tenants at GCTC who were charged more than their actual electrical costs at GCTC.

43. The names and addresses of all Class members can be identified in the business records maintained by the Defendants. The precise number of Class members will be obtained through discovery but based on publicly available information, the numbers are clearly more than can be consolidated in one action, and it is impractical for each Class member to bring suit individually. For example, CBL's annual reports indicates that it owns 88 mall properties across 27 states, including five mall properties in Florida. Those malls contain tens of millions of rentable square feet. As a result, there are likely hundreds of GCTC Class members, thousands of Florida Statutory Class members, and at least tens of thousands of Nationwide Class members, and due to turnover, the actual number of current and former tenants who are Class members is likely a multiple of that amount. The Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**B.    Commonality**

44. There are questions of law and fact that are common to the claims of Plaintiff and the Class. These common questions predominate over any questions that are particular to any individual Class member. Among such common questions of law and fact are the following:

a.    Whether the Defendants marked up the electric charges that they charged the Class members;

b.    Whether JG Gulf Coast breached its lease agreements by charging the GCTC Class members for electricity in excess of what JG Gulf Coast paid the electric utility for that electricity;

c.    Whether JG Gulf Coast breached the implied covenant of good faith and fair dealing in its lease agreements when it charged the GCTC Class members amounts for electricity greater than what JG Gulf Coast paid the electric utility for that electricity;

d.    Whether the Defendants were unjustly enriched by receiving the profits from overcharged Class members for electricity in excess of the actual amounts charged by the electric utilities for that electricity;

e.      Whether the Defendants engaged in a deceptive and unfair business practice by misleading the Class members by causing CBL Management to put in the lease agreement that it would not charge the tenants in excess of the actual costs for electricity and then causing CBL Management to charge them amounts in excess of the actual electricity costs;

f.      Whether Defendants have a policy or practice of overcharging the Class members for energy costs at all of the locations owned by CBL through its holding companies in direct contravention of the lease agreements;

g.      Whether the Defendants in conjunction with Valquest formed a criminal enterprise with the intention of overcharging the Class members for electricity;

h.      Whether the Defendants violated 18 U.S.C. § 1962;

i.      Whether the Defendants violated Florida's Civil RICO statutes; and

j.      The amount of damage the Class members sustained as a result of the Defendants' wrongful conduct, and the proper measure of such damage.

## C.      Typicality

45.     Plaintiff's claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each Class member has sustained damages as a result of the Defendants' wrongful conduct in the same manner as the Plaintiff – that is, each Class member was charged in excess of what the actual costs were for electricity, contrary to: (1) the express terms of the uniform lease agreements where those agreements required that the Class members be charged no more than what the shopping malls paid the utility for that electricity; and (2) applicable law.

## D.      Adequacy of Representation

46.     Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it.  There is no hostility between Plaintiff and the unnamed Class members.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

47.     To prosecute this case, Plaintiff has chosen the law firms of Buckner + Miles, Hagens Berman Sobol Shapiro LLP, and Yormak Employment and Disability Law. These law firms are experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**E.     Requirements of Fed. R. Civ. P. 23(b)(3)**

**1.     Predominance**

48.     The questions of law or fact common to the claims of the Plaintiff and the Class predominate over any questions of law or fact affecting only individual members of the Class.  All claims by Plaintiff and the unnamed Class members are based on the Defendants' deceitful practice of charging the Class members more than what the shopping malls owned by CBL through its holding companies paid the utilities for electricity, in breach of the express terms of the common form lease agreements and applicable state law.

49.     Common issues predominate when, as here, liability can be determined on a Class-wide basis.

50.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

51.     Because all claims by Plaintiff and the unnamed Class members are based on the same misconduct by the Defendants, in particular, that the Defendants charged the Class members more than what the malls paid for electricity—in direct contravention of the express terms of the lease agreements — the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

**2.     Superiority**

52.     A class action is superior to hundreds of individual actions in part because of the non-exhaustive factors listed below:

a.    Joinder of all Class members would create extreme hardship and inconvenience because of their geographical dispersion. Class members reside throughout the United States.

b.    Individual claims by the Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake.  The Defendants are large and well-funded.  Moreover, some of the Class members have ongoing contractual relationships with some of the Defendants, which may make some Class members fearful or reluctant to pursue their claims, even if they had the resources to do so.  As a result, individual Class members are unable to prosecute and control separate actions.

c.    The interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

d.    The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

**COUNT I**
**VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(A), (C)-(D))**
**DEFENDANTS CBL, CBL PARTNERSHIP, CBL MANAGEMENT AND JG GULF COAST**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

53.    Plaintiff re-alleges and incorporates paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54.    CBL conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  Plaintiff brings this count on behalf of a Nationwide Class against CBL, CBL Partnership, CBL Management, and JG Gulf Coast.  At all relevant times, CBL, CBL Partnership, CBL Management, JG Gulf Coast, and Valquest have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

55.    Section 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section

2, Title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

56.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

57.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Sections 1962(a) and (c), among other provisions.  18 U.S.C. § 1962(d).

58.     For many years, CBL sought to illegally increase its profits by wrongfully inflating the cost of electricity to the tenants that rented space at the shopping malls it owned through its holding companies.   CBL exercised control over CBL Partnership.   CBL, through CBL Partnership, created two holding companies, CBL Holdings I and CBL Holdings II, to hold the single purpose entities it created for each shopping mall it purchased.   CBL also created CBL Management, which is entirely owned by CBL Partnership and manages all but nine of CBL's shopping malls.  For example, CBL caused CBL Partnership to create JG Gulf Coast, a single purpose entity to own GCTC, which was held in one of CBL's holding companies.  GCTC was managed by CBL Management, which acted as its agent, signing all of its lease agreements with the tenants at GCTC.

59.     CBL, through its control over CBL Partnership, caused CBL Partnership to have CBL Management include in all of the lease rental agreements used at the shopping malls it owned nationwide through its holding companies, including GCTC, Section 2.4 or its equivalent, which

contained the provision stating that the tenant would not be charged more for electricity than what the shopping mall paid for that electricity.  CBL sometimes directly marked-up and invoiced the tenants for electricity, resulting in inflated energy charges in excess of what the shopping mall paid.  Other times, CBL caused CBL Partnership to have CBL Management mark-up the electrical charges, resulting in CBL Management charging the tenants more than what the shopping mall paid for the electricity.  CBL sometimes sent the marked up invoices through the United States mail to the tenants directly and other times CBL Management sent out the marked-up invoices by U.S. mail to tenants.  The tenants paid the rental and electrical fees, sometimes directly to CBL and other times to CBL Management, by U.S. mail and interstate wire.  For those rental and electrical payments made to CBL Management, the majority of the profits were up streamed to CBL.  For example, CBL Management would receive inflated electrical costs from the tenants at GCTC and pay those funds to JG Gulf Coast.  JG Gulf Coast, in turn, would send those funds through interstate wires to CBL Partners who would then send those funds by interstate wires to CBL.   In order to hide its illegal conduct from scrutiny, CBL caused CBL Partnership to require CBL Management and the single purpose entities it created to own the shopping malls to include a lease provision in the lease agreement requiring tenants to relinquish their right to audit the shopping mall's electrical charges in exchange for the promise of receiving the electricity at the shopping malls' cost.

60.    As part of the enterprise, CBL also conspired with Valquest, an energy company that, among other things, conducts energy surveys, that were used to defraud Plaintiff and the Nationwide Class.  CBL contracted with Valquest to provide false electrical surveys and audits to Plaintiff and the Nationwide and Florida Classes when Class members complained about the

electrical costs charged by CBL, in order to falsely justify and conceal the inflated electrical charges.

61.     Valquest knowingly and intentionally assisted CBL and helped it to defraud Plaintiff and the Nationwide Class by obtaining money through a series of fraudulent misrepresentations and acts.  The association was structured by contracts between and among the participants.  CBL had a contract with Valquest under which Valquest agreed to provide energy surveys to CBL's tenants in exchange for payments from CBL. Valquest's so-called energy audits were nothing more than a sham used to justify the Defendants' mark-up of electrical charges and to help hide their illegal conduct from Plaintiff and the Class.

62.     Accordingly, CBL, CBL Partnership, CBL Management, JG Gulf Coast, and Valquest, along with other unnamed co-conspirators were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mail and wire facilities to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(a), (c)-(d). These acts, committed by interstate wire and through the mails, include: (1) sending and receiving thousands of lease agreements that contained representations that limited the electric charges to tenants to the amount charged by the local electrical utility that the Defendants intended to and did violate; (2) sending tens of thousands of invoices to tenants on a monthly basis through the U.S. mail that falsely represented a charge for energy that was in fact inflated; (3) receiving tens of thousands of the inflated energy payments from the tenants on a monthly basis by interstate wire and through the U.S. mail; and (4) sending fraudulent energy audits by interstate wire and through the U.S. mail.

63.     CBL and its co-conspirators profited handsomely from the enterprise and Plaintiff and the Nationwide Class members suffered because the enterprise significantly increased the amounts paid for electricity by Plaintiff and the Nationwide Class.  While the majority of those overpayments on electricity were received by CBL, smaller amounts of the profits from the marked-up electrical charges were retained by JG Gulf Coast, the other single purpose entities created to own the shopping malls, CBL Management, and CBL Partnership, and some were paid to Valquest.

64.     At all relevant times, CBL, CBL Partnership, CBL Management, Valquest, and JG Gulf Coast, along with other unidentified co-conspirators were associated-in-fact for the common purpose of engaging in the Defendants' profit-making scheme.

65.     The members of the RICO enterprise all share a common purpose: to enrich themselves at Nationwide Class members' expense by maximizing the revenues of CBL, CBL Partnership, CBL Management, JG Gulf Coast, the other single purpose entities CBL created to own its shopping malls, and Valquest, through fraudulently inducing Plaintiff and the Nationwide Class to pay more for electricity than represented to them in the lease agreements through a scheme that used inflated energy audits to help justify the marked up electric charges.  The Defendants increased their profits and Valquest benefitted because it was compensated by CBL for providing the inflated energy audits to Plaintiff and Nationwide Class members.   The Defendants and Valquest shared the bounty of their criminal enterprise, *i.e.,* by sharing the overpayments for electrical charges generated by the joint scheme to defraud the Plaintiff and the Class members.

66.     Each participant in the RICO enterprise had systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  The RICO enterprise and the Defendants functioned as a continuing unit with the

purpose of furthering the illegal scheme and their common purpose of increasing their revenues and profits.  The Defendants participated in the operation and management of the RICO enterprise by directing its affairs as described herein.  While the Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, reporting requirements, and financial statements.

67.    This RICO enterprise has existed for more than six years and continues to exist and operates pursuant to certain agreements entered into between and among CBL, CBL Partnership, CBL Management, JG Gulf Coast, Valquest, and other unnamed co-conspirators.  The RICO enterprise has functioned as a continuing unit and has and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

68.    The Defendants conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  Plaintiff has attached a standard form lease agreement (Ex. A), monthly invoices (Ex. B), and an energy audit (Ex. C) representing the continuity of the Defendants' conduct over multiple years and on a monthly basis, representing more than nineteen separate and distinct instances of mail and wire fraud.  Thus, Plaintiff has demonstrated the continuity of the Defendants' conduct over a fixed period of time.  Furthermore, the Defendants continue to engage in these predicate acts and to harm the Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of CBL's and the other Defendants' open-ended pattern of racketeering activity.

69. CBL received payment for the marked-up electric charges from Plaintiff and the Nationwide Class members sometimes directly and sometimes indirectly through CBL Partnership, CBL Management, JG Gulf Coast, and other unnamed co-conspirators through the United States Postal Service and interstate wire facilities in violation of 18 U.S.C. §§ 1341 and 1343. In furtherance of the scheme, CBL, sometimes directly and sometimes indirectly through CBL Management, CBL Partnership, JG Gulf Coast, and other unnamed co-conspirators committed thousands of separate mail and wire fraud violations on a monthly basis over more than six years through the transmission of its standard form lease agreements, monthly invoices, and energy audits, each one constituting its own separate and distinct predicate act. Each of these violations was related because they shared the common purpose of defrauding Plaintiff and the Nationwide Class by overcharging them for electricity in direct contravention of the express representations of the lease agreement. CBL also transferred between and among, and received sums from, Plaintiff and the Nationwide Class, Valquest, CBL Partnership, CBL Management, JG Gulf Coast, and other unnamed co-conspirators, including but not limited to the payments of the marked-up electricity costs, in furtherance of its scheme to defraud Plaintiff and Nationwide Class members in violation of 18 U.S.C. § 1343.

70. These related acts had the same or similar purpose, results, participants, victims, and methods of commission, and are otherwise related by distinguishing characteristics which are not isolated events.

71. CBL and the other Defendants had the specific intent to participate in the overall RICO enterprise, which is evidenced by its scheme to defraud Plaintiff and the Nationwide Class. CBL's scheme was reasonably calculated to deceive the Plaintiff and Nationwide Class members, all of whom are of ordinary prudence and comprehension, through the execution of its complex,

surreptitious, and illegal mark-up of electricity charges scheme. Plaintiff and Nationwide Class members relied on the uniform misrepresentations in the standard lease agreements that the shopping malls would not charge more for electricity than if the electricity was purchased directly from the local public utility provider.  Plaintiff and the Nationwide Class relied on the uniform misrepresentations in the lease agreements and the invoices believing that they accurately reflected the actual electric costs as required under the standard lease agreements.  Plaintiff and the Nationwide Class relied on the invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

72.     CBL, CBL Partnership, CBL Management, JG Gulf Coast, Valquest, and other unnamed co-conspirators received money from a pattern of racketeering activity and invested that money in the enterprise, and the enterprise affected interstate commerce.  Furthermore, CBL used and invested the income it received through its pattern of racketeering activity to operate its business, which caused Plaintiff and the Nationwide Class members to suffer damages.  The investment of the marked up electricity profits obtained through CBL's deception in the standard lease agreements it caused CBL Management and the single purpose entities it created that owned its shopping malls to use enabled CBL to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and Nationwide Class members on an ongoing basis.  In so doing, CBL and the other Defendants violated Section 1962(a).

73.     CBL and the other Defendants and Valquest conducted and participated both directly and indirectly in the conduct of the above-described RICO enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Specifically, the lease agreements used at the shopping malls CBL owned through its holding companies contained uniform misrepresentations that the Plaintiff and the Class would not be charged more for

electricity than if the Plaintiff and the Class purchased that electricity directly from the local public utility provider.  The invoices sent by U.S. mail to the Plaintiff and the Class, sometimes by CBL directly and sometimes by CBL Management, continued the deception by itemizing the cost for electricity when, in fact, that cost was inflated and represented profit to CBL. Plaintiff and the Nationwide Class, all of whom were of ordinary prudence and comprehension, relied on the uniform misrepresentations in the lease agreements and the invoices, believing that they accurately reflected the actual electric costs as required under the standard lease agreements.  Further, CBL through CBL Partnership, CBL Management, JG Gulf Coast, and the single purpose entities it created to own its shopping malls, contractually barred audits which would have uncovered the scheme, instead only providing false audits produced by Valquest.  Plaintiff and the Nationwide Class relied on the invoiced charges for electricity and the uniform misrepresentations in the inflated energy audits.

74.     CBL, CBL Partnership, CBL Management, JG Gulf Coast, Valquest, and other unnamed co-conspirators, as noted above, conspired to violate sections 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

75.     By reason, and as a result thereof, Defendants' conduct and participation in the racketeering activity described herein has caused Plaintiff and the Nationwide Class to directly incur damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL, CBL Partnership, CBL Management, and JG Gulf Coast for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT II**
**UNJUST ENRICHMENT**
**CBL, CBL MANAGEMENT, AND CBL PARTNERSHIP**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

76.     Plaintiff re-alleges and incorporates paragraphs 1 through 52 of this Complaint as if fully set forth herein.

77.     CBL, CBL Management, and CBL Partnership received, and continue to receive, payments for electricity from Nationwide Class members in excess of what the shopping malls owned by CBL through its holding companies actually paid and pay for that electricity from the local electric utility company.   Instead of charging tenants only for what the shopping malls were charged for electricity as was promised, CBL, CBL Partnership, and CBL Management charged Plaintiff and the Nationwide Class substantially more for that electricity, retaining the excess amount as unearned profit for themselves.   There is no contract between Plaintiff or any Nationwide Class member and CBL, CBL Partnership, or CBL Management that governs the cost of electricity.   Instead, all of those contracts are between the Class members and the single purpose entities CBL created to own its shopping malls.

78.     Plaintiff and the Class directly conferred a benefit on CBL, CBL Partnership, and CBL Management in the form of the money they paid for the marked-up electrical charges.   CBL, CBL Partnership, and CBL Management knowingly and wrongfully accepted and retained that marked-up amount of the electricity costs for their own benefit.   Accordingly, CBL, CBL Partnership, and CBL Management received benefits, in the form of the profits derived from marking up Plaintiff and the National Class' energy charges, that they unjustly retained at the expense of Plaintiff and Nationwide Class members. Moreover, CBL, CBL Partnership, and CBL Management prevented Plaintiff and the Nationwide Class from learning that they were being

charged in excess of the actual costs for electricity because CBL, sometimes directly and sometimes indirectly through CBL Management, provided the Plaintiff and the National Class with inflated energy surveys and would not turn over to Plaintiff and members of the Nationwide Class the actual electric bills for the shopping malls.

79.     The circumstances are such that it would be inequitable to allow CBL, CBL Partnership, and CBL Management to retain the payments they collected from Plaintiff and the Nationwide Class members that were in excess of what the shopping malls owned by CBL through its holding companies paid the local utilities for that same electricity.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL, CBL Partnership, and CBL Management for compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT III**
**VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**CBL, CBL PARTNERSHIP, CBL MANAGEMENT**
**(ON BEHALF OF THE FLORIDA STATUTORY CLASS)**

80.     Plaintiff re-alleges and incorporates paragraphs 1 through 52 of this Complaint as if fully set forth herein.

81.     This Count is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

82.     At all times material, Plaintiff and all members of the Florida Statutory Class were consumers within the meaning of Section 501.203, Fla. Stat., and are entitled to relief under FDUTPA in accordance with Section 501.211, Fla. Stat.

83.     At all times material, CBL, CBL Partnership, and CBL Management conducted trade and commerce within the meaning of Section 501.203, Fla. Stat.

84.     CBL, CBL Partnership, and CBL Management have engaged in unlawful schemes and courses of conduct through one or more of the unfair and deceptive acts and practices alleged above.

85.     The concealment and omissions of material facts and misrepresentations and deceptions alleged in the preceding paragraphs occurred in connection with CBL's, CBL Partnerships' and CBL Management's trade and commerce in Florida.

86.     CBL's, CBL Partnerships' and CBL Management's unfair and deceptive acts and practices violated FDUTPA, Sections 501.201 and 501.211, Fla. Stat.

87.     As a direct and proximate result of CBL's, CBL Partnerships' and CBL Management's FDUTPA violations, Plaintiff and the Florida Statutory Class have been damaged in an amount to be proven at trial.

88.     Plaintiff and the Florida Statutory Class are entitled to actual damages, attorneys' fees and costs, and all other remedies available under FDUTPA.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL, CBL Partnership, and CBL Management for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT IV**
**VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT,**
**FLA. STAT.  §§ 772.103, 772.104(1), 777.011, AND 777.03(1)(A)**
**CBL, CBL PARTNERSHIP, CBL MANAGEMENT**
**(ON BEHALF OF THE FLORIDA STATUTORY CLASS)**

89.     Plaintiff re-alleges and incorporates paragraphs 1 through 52, and 54 through 75, of this Complaint as if fully set forth herein.

90.     As described above, CBL, CBL Partnership, CBL Management, Valquest, and other unnamed co-conspirators, were associated in an enterprise and conspired, aided and abetted and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, in violation of Fla. Stat. §§ 772.103, 772.104(1), 777.011, and 777.03(1)(a).

91.     In furtherance of its scheme, CBL, CBL Partnership, CBL Management, and other unnamed co-conspirators engaged in thousands of acts of mail and wire fraud for more than six years in violation of federal law, as set forth above, and Fla. Stat. § 817.034.

92.     CBL, CBL Partnership, CBL Management, Valquest, and other unnamed co-conspirators engaged in a pattern of racketeering activity and engaged in more than two incidents of racketeering or racketeering conduct that has the same or similar intents, results, accomplices, victims, or methods of commission, and that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

93.     Plaintiff has attached a standard lease agreement (Ex. A), monthly invoices (Ex. B), and an energy survey (Ex. C), that represent the continuity of Defendants' conduct over multiple years and on a monthly basis and are nineteen separate and distinct examples of mail and wire fraud violations. Thus, Plaintiff has demonstrated the continuity of the Defendants' conduct over a fixed period of time.  Furthermore, CBL, CBL Management, CBL Partnership, and Valquest continue to engage in these predicate acts and harm Florida Statutory Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of CBL's, CBL Management's, and CBL Partnerships' open-ended pattern of racketeering activity.

94.     CBL, CBL Management, and CBL Partnership used and invested the income they received through their pattern of racketeering activity to operate their business which caused

Plaintiff and the Florida Statutory Class members to suffer direct damages. The investment of the marked-up energy costs obtained by CBL, CBL Partnership, and CBL Management through their illegal conduct of marking up the tenants' electrical charges enabled CBL, CBL Partnership, and CBL Management to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and the Florida Statutory Class members.

95.     By reason, and as a result thereof, CBL's, CBL Management's, and CBL Partnerships' conduct and participation in the racketeering activity described herein directly caused Plaintiff and the Florida Statutory Class members to incur significant and substantial damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against CBL, CBL Partnership, and CBL Management for compensatory and treble damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT V**
**BREACH OF CONTRACT**
**JG GULF COAST**
**(ON BEHALF OF THE GCTC CLASS)**

96.     Plaintiff re-alleges and incorporates paragraphs 1 through 52 of this Complaint as if fully set forth herein.

97.     JG Gulf Coast entered into lease agreements with Plaintiff and the GCTC Class members for the use of the premises located at GCTC, for the purpose of retail sales and related services.

98.     In Plaintiff's and the GCTC Class members' lease agreements, JG Gulf Coast stated with respect to electrical charges that the "Tenant shall not be charged more than the rates it would be charged for same services if furnished directly to the Leased Premises by the Local Utility

Company. . . ." Accordingly, JG Gulf Coast promised Plaintiff and the GCTC Class members that it would not mark-up their electrical costs and that Plaintiff and the GCTC Class members would be charged the same amount by JG Gulf Coast for electricity as if they had purchased that electricity directly from the local public utility provider.

99.     JG Gulf Coast, at the direction of CBL, also put in the lease agreements provided to Plaintiff and the GCTC Class members a provision that in exchange for providing Plaintiff and the GCTC Class members energy at JG Gulf Coast's cost, the GCTC Class members waived their audit rights to review JG Gulf Coast's electric bills.  CBL directed JG Gulf Coast to insert this provision to insulate its illegal conduct from the scrutiny of Plaintiff and the GCTC Class members.

100.    JG Gulf Coast breached the lease agreements with Plaintiff and the GCTC Class members by marking up their electrical costs and charging them more for electricity than JG Gulf Coast actually paid the local electric utility for that same electricity.

101.    By marking up Plaintiff's and the GCTC Class members' electrical costs and charging them amounts in excess of what JG Gulf Coast actually paid the electric utility for that same electricity, JG Gulf Coast breached its lease agreements with Plaintiff and the GCTC Class members, resulting in damages to Plaintiff and the GCTC Class members.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against JG Gulf Coast for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**COUNT VI**
**BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**
**JG GULF COAST**
**(ON BEHALF OF THE GCTC CLASS)**

102.    Plaintiff re-alleges and incorporates paragraphs 1 through 52 of this Complaint as if fully set forth herein.

103.    The implied covenant of good faith and fair dealing applies to every contract and relates to an express term of a contract.

104.    The purpose of the implied duty of good faith is to protect the parties' reasonable commercial expectations.  The question arises when one party has a discretionary decision without defined standards.

105.    JG Gulf Coast entered into lease agreements with Plaintiff and the members of the GCTC Class for the use of premises owned by JG Gulf Coast for the purpose of retail sales and related services.

106.    In Plaintiff's and the GCTC Class members' lease agreements with respect to electric charges, JG Gulf Coast expressly agreed that "Tenant shall not be charged more than the rates it would be charged for same services if furnished directly to the Leased Premises by the Local Utility Company. . . ." Accordingly, JG Gulf Coast promised Plaintiff and the GCTC Class members that it would not mark-up their electric costs and that Plaintiff and the GCTC Class would be charged by JG Gulf Coast the same amount for electricity as if they were purchasing that electricity directly from the local electric utility.  JG Gulf Coast had an implied duty of good faith to charge the appropriate amount.

107.    JG Gulf Coast also put in the lease agreements a provision that in exchange for providing Plaintiff and GCTC Class members energy at the actual cost of such energy, that they

waived their audit rights to review JG Gulf Coast's electric bills.  JG Gulf Coast inserted this provision to insulate its illegal conduct from the scrutiny of Plaintiff and the GCTC Class.

108.     By charging Plaintiff and the GCTC Class amounts greater than what JG Gulf Coast actually paid for the electricity, JG Gulf Coast breached the implied covenant of good faith and fair dealing attached to the terms of the contract.  Accordingly, Plaintiff and the GCTC Class members suffered damages.

**WHEREFORE**, Plaintiff, on behalf of itself and all similarly situated individuals and entities, demands judgment against JG Gulf Coast for compensatory damages, pre- and post-judgment interest, attorneys' fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

A.     Certify this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3); appoint Plaintiff the representative of the Nationwide Class, the Florida Statutory Class, and the GCTC Class; and appoint Buckner + Miles, Hagens Berman Sobol Shapiro LLP, and Yormak Employment and Disability Law as Class Counsel.

B.     Award Plaintiff and the Class all common law, compensatory, and special damages as well as restitution and statutory remedies for CBL's, CBL Partnerships', CBL Management's and JG Gulf Coast's violations of law and breaches of contract, including pre- and post-judgment interest on these amounts.

C.     Award Plaintiff and the Class treble damages.

D.     Award Plaintiff and the Class their attorney's fees, costs, and expenses.

E.     Award Plaintiff and the Class such further relief as is appropriate in the interests of justice.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial on any and all counts for which trial by jury is permitted by law.

DATED:  July 1, 2016                         Respectfully submitted,

**BUCKNER + MILES**

By /s/ David M. Buckner
    David M. Buckner, Esq., FBN 60550
    Seth E. Miles, Esq., FBN 385530
    Brett E. von Borke, Esq., FBN 0044802
    3350 Mary Street
    Coconut Grove, Florida 33133
    Telephone: 305.964.8003
    E-mail: david@bucknermiles.com
    E-mail: seth@bucknermiles.com
    E-mail: vonborke@bucknermiles.com

    Steve W. Berman (*pro hac vice*)
    Thomas E. Loeser (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 8th Avenue, Suite 3300
    Seattle, WA 98101
    Telephone:  206.623.7292
    Facsimile:  206.623.0594
    E-mail: steve@hbsslaw.com
    E-mail: toml@hbsslaw.com

    Benjamin H. Yormak, Esq., FBN 71272
    YORMAK EMPLOYMENT &
      DISABILITY LAW
    99900 Coconut Road
    Bonita Springs, Florida 34135
    Telephone: 239.985.9691
    E-mail: byormak@yormaklaw.com

    *Counsel for Plaintiff and the Proposed Classes*